**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **HARRY MUSTARI,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **No. 12 C 9455** |
| | ) | |
| **RANDY PFISTER,** | ) | |
| | ) | |
| **Respondent.** | ) | |

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In September 2005, an Illinois jury convicted Harry Mustari of three counts of attempt first-degree murder and three counts of aggravated battery with a firearm in connection with a 2003 shooting in Maywood, Illinois. The Illinois Appellate Court affirmed Mustari's conviction on direct appeal. After the Illinois Supreme Court denied Mustari's petition for leave to appeal, he filed a petition for post-conviction relief in the Circuit Court of Cook County, which that court denied. The Illinois Appellate Court affirmed that decision, and the Illinois Supreme Court denied Mustari's petition for leave to appeal.

Mustari has now petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent Randy Pfister, the warden of the prison where Mustari is incarcerated, argues that four of Mustari's claims are procedurally defaulted; the state courts' rulings on three of his claims were not unreasonable; and the remaining two claims (which are Fourth Amendment claims) are barred because Mustari had a full and

fair hearing on them in the state courts.[1]  Alternatively, Pfister argues that two of

Mustari's claims are not cognizable in federal court because they are grounded in state

law.  Mustari waived the filing of a reply.  For the following reasons, the Court denies

Mustari's petition.

## Background

**A.    Trial court proceedings**

By way of introduction, the Court adopts the following summary from the Illinois

Appellate Court's opinion on direct appeal in this case:

> On July 13, 2003, a group of friends, including Ernesto Diaz, Fernando
> Cabral, Richard Ramirez, Ivan Palomares, and Jaime Diaz, gathered at
> Ernesto's home in Maywood, Illinois.  At around 10 p.m., defendant and
> Romero Navarez rode by on bicycles, indicated their gang affiliation with
> the Latin Kings, and defendant told the group of friends that they had "five
> minutes to get off the block."  A few minutes later, a vehicle with three to
> five occupants, including Latin King members Johnny Garza, Alex Garcia,
> and Michael Martinez, drove up to Ernesto's house looking for the resident
> of the house. Ernesto spoke to them and explained that he and his friends
> were not in any gang.  Martinez shook Ernesto's hand, told him he and his
> friends could stay, and the vehicle departed.  A few minutes later,
> defendant approached Emesto's residence on foot.  Another person also
> approached from a different direction but no one was able to identify him.
> When defendant was about two houses away, he reached into his
> waistband and retrieved a handgun.  Defendant yelled, "You're [sic] five
> minutes are up," and repeatedly shouted, "I told you, I told you."
> Defendant put one hand up to his face to cover his mouth, pointed his gun
> at the group of friends, and fired five shots. One of the five shots struck
> Ernesto and fractured his left hip.  Another struck Cabral, fracturing his
> cervical spine and subsequently paralyzing him from the neck down. He
> was eventually able to regain some movement in his left leg and arm.
> Two of the other shots struck Palomares, puncturing his kidney and
> causing a lumbar spinal fracture.  After a jury trial, defendant was
> convicted of three counts of attempt first-degree murder and three counts

---

[1] Mustari's petition lists seven claims.  However, Pfister has responded to nine claims,
separating two of Mustari's claims from his petition into two distinct claims.  The Court
disagrees that Mustari's excessive sentence claim should be split into two claims, but
agrees that his ineffective assistance of counsel claim should be two claims.  The Court
therefore addresses eight claims.

of aggravated battery with a firearm.  Defendant was sentenced to two
consecutive 30 year sentences, as well as two 30 year sentences and two
25 year sentences that will be served concurrently.

Resp.'s Ex. A at 2–3.

Before the jury was empaneled in Mustari's trial, the circuit court held a two-day

hearing on two motions by Mustari.  The court first heard a motion by Mustari to quash

his arrest.  Mustari claimed, through counsel, that the officers who arrested him did not

have probable cause to do so.  He called several witnesses, including Maywood police

officer Jeremy Pezdek, who arrested Mustari for the shooting, and a Maywood detective

named Randy Brown who investigated the shooting.  Both testified that there was no

warrant for Mustari's arrest and that witnesses at the scene of the shooting had

identified the shooter as "Taz."  Pezdek said he knew "Taz" to be a nickname for

Mustari, and told Brown about his knowledge at the time of the investigation.  Mustari

called no other witnesses, and the prosecution rested without calling any.  The court

denied Mustari's motion to quash.  The court stated that testimony regarding eyewitness

identification of "Taz" as the shooter, combined with the officers' knowledge that "Taz"

was associated with Mustari, was sufficient to establish probable cause for Mustari's

arrest.

The court also held a hearing on Mustari's motion to suppress his statement to

police.  Mustari contended that he was in police custody in Maywood for "several days,"

during which he was denied sleep and food and was threatened and beaten by police

officers.  Resp.'s Ex. M at 6.  He also argued that the length of his detention contributed

to the totality of circumstances amounting to a coercive environment.  The parties called

several witnesses to testify.  The prosecution called two investigators who were present

for the police interrogation of Mustari, including detective Brown, who testified that Mustari was able to eat, see family members, sleep, and make phone calls during his stay at the police station. The officers also said they explained Mustari's *Miranda* rights to him and then memorialized his confession, which he was permitted to review and alter. Mustari called his sister and his grandmother as witnesses. They testified that they had difficulty getting in to see Mustari while he was in police custody after his arrest but that they ultimately saw him late on his third day in custody. Mustari testified extensively about his arrest, detention, and interrogation by police. His testimony differed from that of the arresting and interrogating officers on several points. Mustari said the officers accused him of lying and hit, kicked, and threatened him, eventually coercing him into falsifying a story about committing the shooting. He also discussed his mental health, including his diagnosis of attention deficit hyperactivity disorder (ADHD) at age 13. Mustari testified on cross-examination that he had never taken medication for the disorder and that he had not been told to take it since age 13.

The prosecution called in rebuttal the Maywood police officer Mustari accused of coercing his confession as a rebuttal witness, and counsel for both sides gave closing statements. The court denied Mustari's motion. It concluded that the totality of circumstances showed "that the defendant waived his Miranda Rights without coercion and that his will was not overborne." Resp.'s Ex. N at 170. The Court therefore ruled that Mustari's inculpatory post-arrest statement was admissible at his trial.

At the trial, the prosecution first called officer Pezdek, who repeated some of his testimony from the prior motion hearing. He testified that he was on duty on July 13, 2003, when he heard a call on his radio for shots fired and men down. Afterward, he

went to the location of the shooting, where he saw "[a] commotion" and "two men lying down" on the grass outside a house in Maywood. Resp.'s Ex. O at 26–27. At that time, Pezdek testified, police units were responding to the area. Pezdek called for paramedics, and the shooting victims were treated at the scene. Pezdek worked to secure the crime scene, and he listened to detective Brown as he questioned witnesses who were at the scene.

Skipping ahead a bit, detective Brown testified at Mustari's trial that when he arrived at the scene of the shooting, he "got all the witnesses together" and "started taking statements—well, listening to what they had to say in reference to the shooting." Resp.'s Ex. R at 60. Brown identified the witnesses as Jaime Diaz, Ernesto Diaz, Giovanni Herrera, Richard Ramirez, and perhaps two others whose names he did not recall. Brown was asked "When you spoke with Jaime Diaz, did he supply you with the name of the shooter?" After the trial court overruled defense counsel's objection, Brown replied, "He went by the name of Taz." *Id.* at 61. Similarly, Pedzek was asked whether he had learned the identity of the shooter at the scene and, after the court overruled defense counsel's objection, stated "[t]he nickname that I heard was Taz." *Id.* at 30. Pedzek did not identify the witness who had supplied the name.

Pedzek was asked whether he knew Taz's real name pursuant to his duties as a police officer, and he replied that Taz's name was Harry Mustari. Brown likewise testified that Pedzek told him that this was Taz's real name. Brown further testified that a witness, unnamed, gave him a description of a white male with a medium build, wearing a white t-shirt and jeans.

The next day, Pezdek testified, he saw Mustari walking in Maywood and arrested him. After Mustari was arrested, Brown testified, he was placed in a line-up, where Jaime Diaz identified him as the shooter, as did another eyewitness, Richard Ramirez.

After Brown testified, the prosecution called Jaime Diaz as a witness. Diaz said he was at his brother Ernesto's house with several others on July 13, 2003 when two individuals rode by on bikes warning the group to clear the block. Diaz testified that he recognized one of them as Taz from having played Pop Warner football with him in sixth grade, and that his real name was Harry. (Diaz identified Mustari in court as the person he saw that day.) Diaz said that Mustari later returned on foot, told the group that its five minutes were up, pulled out a gun, covered his face, and began firing. When police arrived at the scene, Diaz testified, he spoke with detective Brown and told him that Taz was the shooter. Diaz also said he later identified Mustari in a lineup as the shooter.

The prosecution also called the surgeon who examined the gunshot victims, as well as an evidence technician who surveyed the crime scene and the victims themselves. In addition, the prosecution called Richard Ramirez, who identified Mustari in court as the shooter and testified that he identified Mustari as the shooter in a police lineup on July 16, 2003. On cross-examination, defense counsel elicited from Ramirez that he had been convicted of unlawful use of a weapon, a felony. When defense counsel then asked Ramirez if he was placed on two years' probation for that offense, the prosecution objected. The court sustained the objection. In a discussion at sidebar, defense counsel renewed the objection, arguing that the question about Ramirez's probation "goes to bias or motive to testify a certain way," but the court disagreed. Resp.'s Ex. Q at 250. The assistant state's attorney who participated in taking Mustari's

post-arrest statement also testified.  He stated that he memorialized Mustari's confession with Mustari's approval and ascertained from Mustari that he was being treated well by the Maywood officers.  The defense called Mustari's grandmother and sister, who testified they were not permitted to see Mustari while he was in police custody until after he had confessed to the shooting.

During his rebuttal argument, one of the prosecutors trying the case made this statement:  "The bottom line is the only person who said the Defendant wasn't out there, and that the Defendant wasn't the shooter, and the Defendant wasn't doing all this gang banging[,] was the Defense counselor."  Resp.'s Ex. S at 44.  The defense objected to this statement, but the trial court overruled the objection.  After the jury was sent to deliberate, defense counsel moved for a mistrial on the basis of the rebuttal argument, contending that the prosecutor's comment shifted the burden of proof to the defendant; the court denied the motion.  The jury later convicted Mustari of three counts of attempt first-degree murder, and three counts of aggravated battery with a firearm.

At Mustari's sentencing hearing, the court heard witnesses and stated that it considered aggravation and mitigation evidence.  This evidence included statements from Mustari's family, his criminal and mental health history, his rehabilitation potential, the seriousness of his offenses, and his own "nature and character."  Resp.'s Ex. T at 68.  The court sentenced Mustari to two consecutive thirty-year terms, to run concurrently with twenty-five- and thirty-year terms on the other counts against Mustari. The court noted that Mustari had to serve eighty-five percent of the sentence under Illinois law.

**B.     Appeal and post-conviction proceedings**

Mustari appealed his conviction in October 2006.  He argued that the trial court should have granted his motions to quash his arrest and to suppress his statements to police and that should not have admitted testimony from officer Pezdek and detective Brown about eyewitness identification of Taz as the shooter at the crime scene.  Mustari further argued the court should not have precluded the defense from eliciting testimony from prosecution witness Richard Ramirez about his probation status at the time of the shooting.  Mustari also contended, among other things, that the prosecution impermissibly commented on his silence during its rebuttal argument and that his sentence was excessive because it did not comply with the Illinois constitutional requirement requiring a balancing of aggravating and mitigating factors.

The Illinois Appellate Court affirmed Mustari's conviction.  It first held that probable cause existed for Mustari's arrest because the Maywood officers had an eyewitness identification of Taz, whom Pezdek knew to be Mustari.  The court next concluded that the trial court's denial of Mustari's motion to suppress his confession was not manifestly erroneous.  It noted that Mustari was frequently apprised of his *Miranda* rights, no evidence supported his allegations of physical abuse by officers, and he signed statements attesting to good treatment by police.  The court also said that "the length of time in custody is only one factor to be considered and we do not find that interviewing defendant three times over two days was sufficiently significant to warrant suppressing his statements."  Resp.'s Ex. D at 6.  Next, the court determined that Pezdek's and Brown's statements about out-of-court eyewitness identifications of Taz were not improperly admitted.  The court observed that an eyewitness who said Taz

was the shooter, Diaz, "eventually testified at trial and was subjected to a thorough cross-examination as to his ability to identify defendant." *Id.* at 7. It also determined that the identification was admitted "[i]n order [for the officers] to fully explain their investigation and how they were able to identify Harry Mustari as Taz." *Id.* at 8. Further, the court held that the admission of the statements did not violate the Confrontation Clause of the Sixth Amendment, because they were admissible non-hearsay. *Id.* (citing *Crawford v. Washington*, 541 U.S. 36, 59 (2004)).

The appellate court went on to hold that it was not a Confrontation Clause violation for the court to disallow Mustari from cross-examining witness Ramirez about his past probation status. The court distinguished the situations of the witnesses in the cases Mustari cited from that of Ramirez when he testified. *See id.* at 11 (citing *People v. Foley*, 109 Ill App. 3d 1010, 441 N.E.2d 655 (1982); *People v. Baptiste*, 37 Ill. App. 3d 808, 347 N.E.2d 92 (1976)). The court stated that Ramirez "was not on probation at the time of trial, had no pending charges against him at the time of trial, was not an accomplice, and had already admitted that he had been convicted of aggravated unlawful use of a weapon." *Id.* Therefore, it was not an abuse of discretion for the trial court to limit Mustari's cross-examination of Ramirez on the subject of his prior probation status. The court reached a similar conclusion on Mustari's argument that the prosecution made improper comments in rebuttal. The prosecution's statement was not improper, the court held, because it was intended to show that the state witnesses contradicted Mustari's theory. Finally, the court held that Mustari's sentence was not an abuse of discretion, because there is a presumption that the trial court considered mitigating evidence, and because of Mustari's criminal record and the nature of his

crime.

Mustari filed a petition for leave to appeal (PLA) the appellate court's decision. In that petition, he raised seven issues for review. Among other arguments, he again challenged the denial of his motion to quash arrest and his motion to suppress his post-arrest statement on the basis of the length of his detention. Mustari also argued that the appellate court mischaracterized his mental health history in stating that there was no evidence of his having a mental disability; he argued that the court ignored his ADHD diagnosis and refusal to take medication for it. He again contended that the trial court should not have admitted testimony from Pezdek and Brown about the out-of-court eyewitness identifications because they were hearsay and violated the Confrontation Clause. And Mustari reprised his argument that he should have been permitted to cross-examine Ramirez on his past probation status in accordance with the Confrontation Clause. As for his sentence, he repeated an argument from his appeal that the prosecution asked the trial court to "warehouse" Mustari for his conviction, which he argued was an improper aggravating factor. Mustari did not, however, maintain his argument from his appeal that the prosecution improperly commented upon his silence in its rebuttal argument at trial. The Supreme Court denied the PLA.

Mustari filed a *pro se* post-conviction petition in the Circuit Court of Cook County in July 2009. As the appellate court noted on Mustari's appeal of the circuit court's denial of his petition:

> In the petition, defendant argued, *inter alia*, that he was unfit to stand trial
> and that trial counsel was ineffective for failing to investigate and argue his
> unfitness. He argued that appellate counsel, in turn, was also ineffective
> for failing to raise the issue on appeal. In support, defendant alleged that
> he had a history of mental illness including attention deficit hyperactivity,
> explosive, and panic disorders, of which trial counsel was aware.

> Defendant acknowledged that trial counsel had set forth his mental illness
> as a defense during pretrial proceedings, but argued that counsel did not
> pursue the issue further.  Defendant alleged that he was not medicated at
> trial and as such lacked understanding of the proceedings.

*People v. Mustari*, 2011 IL App (1st) 100328-U, ¶ 6.  Mustari also argued that prejudicial

evidence was improperly admitted against him, specifically evidence on his prior gang

activity.  The circuit court made an oral ruling denying Mustari's petition.  It first

concluded that Mustari did not show he could not assist in his defense or understand his

trial proceedings.  The court also ruled that the gang evidence was properly admitted for

the purpose of explaining the circumstances of the shooting and subsequent

investigation.  The court then determined that Mustari had not satisfied the "Strickland

Test that either trial or appellate counsels were ineffective in the handling of this case."

Resp.'s Ex. V at A4.  The court therefore held that the petition was "frivolous and

patently . . . without merit."  *Id.*

On appeal, Mustari argued that the evidence supported his argument that he had

a "pre-existing psychiatric condition" at trial, including a 2002 evaluation indicating

depression, cannabis dependence, alcohol abuse, conduct disorder, ADHD, and other

issues.  Resp.'s Ex. G at 10.  Mustari's trial counsel was aware of these issues, he

argued, and should have investigated his background or asserted he was unfit for trial.

Therefore, Mustari contended, he had made out the gist of a constitutional claim, citing

*Strickland v. Washington*, 466 U.S. 668 (1984), and his post-conviction petition should

not have been dismissed.  He also reiterated his argument that appellate counsel's

failure to raise this issue on direct appeal was ineffective.

The appellate court, focusing on the prejudice prong of *Strickland*, affirmed the

dismissal of Mustari's post-conviction petition.  The court first noted that under

*Strickland*, prejudice resulting from an attorney's failure to request a fitness hearing stems from a showing of facts raising *bona fide* doubt of a defendant's ability to understand his proceedings or assist in his defense because of his mental or physical condition.  It held that "even taking defendant's allegations as true, we conclude that defendant has not established that his mental illness made him unfit."  *Mustari*, 2011 IL App (1st) 100328-U, ¶ 17.  The court pointed to Mustari's pretrial hearing, at which he "participated in his own defense by testifying cogently and coherently, absent any expression of confusion, over some 89 pages of transcript that he was beaten and bribed by police officers to the point where he inculpated himself in the offense."  *Id.* The court also cited reports of two evaluating mental health professionals about Mustari, neither of whom recommended a course of medication.  One of those evaluators, the court said, observed that Mustari was "oriented to person, place, and time" and did not see "signs of psychotic symptomology." *Id.* ¶ 18.  Because Mustari could not show a *bona fide* doubt of his fitness on these facts, the court concluded that trial counsel was not ineffective for failing to request a hearing on Mustari's fitness.  It therefore affirmed the dismissal of his post-conviction petition.

In a subsequent PLA to the Illinois Supreme Court, Mustari again argued that his trial counsel was ineffective for failing to investigate his mental health history and request a fitness hearing at trial.  He also contended that his appellate counsel failed to raise this issue on appeal, which "was objectively unreasonably [sic] and prejudice arguably resulted."  Resp.'s Ex. K at 11.  The Supreme Court denied Mustari's PLA in May 2012.

**C.  Mustari's habeas corpus petition**

Mustari filed a *pro se* habeas corpus petition in this Court in November 2012.  He argues seven claims:  (1) probable cause did not support his arrest; (2) his confession should have been suppressed due to the length of his detention; (3) the admission of Pezdek's and Brown's testimony on out-of-court eyewitness identifications of Taz as the shooter violated the Confrontation Clause; (4) under the Confrontation Clause, he should have been permitted to cross-examine Ramirez on his past probation status; (5) the prosecutor improperly commented upon Mustari's silence; (6) his sentence was disproportionate to others for the same conduct and was excessive; and (7) his trial counsel was ineffective for failing to investigate and raise his mental fitness, and appellate counsel was ineffective for failing to raise the issue on direct appeal.  Pfister contends in response that some of these claims are procedurally defaulted, that others are barred because Mustari had a full and fair hearing on them in the state courts, and that the remaining claims are otherwise meritless.

## Discussion

A petitioner is entitled to a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  A federal court may issue a writ of habeas corpus on a claim that was adjudicated on the merits in state court proceedings only if the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *Id.* § 2254(d); *see also*

*Hanson v. Beth*, 738 F.3d 158, 166 (7th Cir. 2013).

## A.     Probable cause for arrest

Mustari contends that the appellate court unreasonably applied federal law in ruling on direct appeal that probable cause supported his arrest.  He argues that the record did not support this decision, because the police gained information that a person nicknamed Taz did the shooting based on reports from "unknown persons."  Pet. at 6.  These reports were vague and unreliable, Mustari says, adding that detective Brown could not name the witnesses.  Therefore, he says, his arrest violated the Fourth Amendment, as it was an unreasonable search and seizure.

The Fourth Amendment to the Constitution forbids violation of the right of citizens to be secure from unreasonable searches and seizures.  Under *Stone v. Powell*, 428 U.S. 465 (1976), habeas corpus relief is unavailable on a Fourth Amendment claim when evidence obtained in an unconstitutional search or seizure is introduced at trial, but the state has already provided the petitioner "full and fair litigation" of the claim.  *Id.* at 494.  This Court's role "is not to second-guess the state court on the merits of the petitioner's claim, but rather to assure ourselves that the state court heard the claim, looked to the right body of case law, and rendered an intellectually honest decision." *Monroe v. Davis*, 712 F.3d 1106, 1114 (7th Cir. 2013).

This is a high standard to overcome, and Mustari does not make an argument that would allow him to do so.  The trial court's hearing on his probable cause claim was full and fair.  Mustari was permitted to call witnesses; he called the arresting officer and lead investigating detective in his case.  His trial counsel gave opening and closing arguments on his motion to quash his arrest.  Although the prosecution called no

witnesses at the hearing, Mustari's counsel would have had the right to cross-examine them. Furthermore, there is no indication that the trial court failed to engage in a good faith review of the motion. The trial court provided reasons for its denial of the motion in an oral decision that cited the facts provided as well as case law to support its conclusion. Mustari does not argue otherwise. Given these facts, *Stone v. Powell* precludes this Court from reviewing Mustari's Fourth Amendment claim regarding the existence of probable cause to support his arrest.

**B.     Voluntariness of confession**

Mustari argues a second Fourth Amendment issue in his second claim: that he "gave an involuntary statement after 52 hours of . . . illegal detainment" and that the statement should have been suppressed. Pet. at 6. As support, he cites *Gerstein v. Pugh*, 420 U.S. 103 (1975), and *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991), arguing that these cases hold that the government has the burden to demonstrate the length of his detention was justified by an emergency or other extraordinary circumstance. He then argues that Illinois case law incorrectly interprets the standard from *Pugh* and *McLaughlin*. Mustari also contends that the trial court improperly placed the evidentiary burden on him at the hearing on his motion to quash his arrest (although he concedes that he bore the initial burden on his motion and does not argue about where the court placed the burden on his suppression motion).

Mustari must overcome *Stone v. Powell* in order for the Court to consider his claim here, and it is apparent that he does not do so. As noted above, Fourth Amendment claims of this nature cannot succeed in a habeas corpus proceeding if the reviewing court is assured that the state court heard the claim, referenced proper case

law, and that its decision was intellectually honest. *Monroe*, 712 F.3d at 1114. Those elements were undoubtedly in place at the trial court's hearing on Mustari's suppression motion. In fact, the hearing on the suppression motion was every bit as extensive as the one it held on Mustari's motion to quash arrest. Both sides called witnesses, and Mustari's counsel cross-examined the witnesses the prosecution called. Mustari called his grandmother and sister to testify. And Mustari himself testified extensively, presenting his version of the story of his detention and interrogation. The trial court, in its oral ruling, properly noted that it was examining the totality of the evidence to decide whether the statement was improperly given. It then provided reasons based on the evidence it had heard and upon appropriate Illinois case law why the totality of circumstances showed that Mustari's "will was not overborne." Resp.'s Ex. N at 170.

It is possible to consider Mustari's argument that the trial court improperly shifted the burden to him as a claim that the court's hearing was not full or fair. It is apparent from the trial court's ruling, however, not only that it considered all the evidence from the hearing, but that it placed the burden on the prosecution to prove that Mustari's statement was involuntarily given. *See* Resp.'s Ex. N at 168 ("The burden of proof is on the state to prove that the defendant's statements were voluntary by a preponderance of the evidence."). Nonetheless, one may construe Mustari's improper burden argument as charging that the trial court incorrectly assigned the overall burden to him on his motion to quash his arrest for lack of probable cause, which in turn tainted his statement to the police. Yet Mustari concedes that he had the initial burden on that motion, and it is clear that the trial court did not believe that Mustari met that burden with sufficient evidence to shift the burden to the prosecution. It cited multiple significant items of

evidence and case law to support its conclusion that probable cause properly supported

Mustari's arrest, including eyewitness statements and the officers' collective knowledge

regarding Mustari.

The Court is persuaded that both pretrial hearings Mustari received were full and

fair and that it therefore may not consider Mustari's Fourth Amendment claim on this

issue.  The Court need not reach Pfister's remaining arguments on this claim.

## C.      Police testimony on out-of-court eyewitness identification

Here, Mustari contends that his constitutional right to confront witnesses against

him was violated when the trial court permitted the prosecution to elicit testimony on

out-of-court eyewitness statements identifying Mustari as the shooter.  Specifically, he

says that Brown's testimony about eyewitnesses identifying the shooter as Taz, and

Pezdek's testimony that he overheard the eyewitness statements, were hearsay and

that the witnesses's statements were testimonial in nature.  "[T]he Petitioner was not

given the names of 'witnesses' at the scene, let alone afforded an opportunity for cross-

examination," Mustari says.  Pet. at 10.  Therefore, he argues, the testimony was not

permitted per *Davis v. Washington*, 547 U.S. 813 (2006) and *Crawford*, 541 U.S. at 43.

In response, Pfister argues that the appellate court's resolution of this claim when

Mustari made it on appeal was not unreasonable.  Pfister says that the appellate court

correctly held that Brown's testimony about Diaz's statement was admissible because

Diaz was later cross-examined.  Pfister also contends that the appellate court was

reasonable when it admitted the officers' testimony about the eyewitness identifications

because it was admitted "as explanation of how the investigation led to petitioner."

Resp. at 20 (citing Resp.'s Ex. D at 7–8).  Further, Pfister says, the eyewitness

statements were admissible under *Davis* and *Michigan v. Bryant*, 131 S. Ct. 1143, 1166 (2011) because they were initially elicited to assist police in meeting an ongoing emergency.

The Sixth Amendment to the Constitution affords an accused the right "to be confronted with the witnesses against him." However, the Confrontation Clause is not implicated when an out-of-court declarant is subject to cross-examination at trial. *See Crawford*, 541 U.S. at 59 n.9 ("[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements."); *California v. Green*, 399 U.S. 149, 158 (1970) ("[T]he Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination.").

Mustari had the opportunity at trial to confront and cross-examine the eyewitness whose statement he contends should not have been allowed into court. Mustari contends that he "was not given the names" of the eyewitnesses who named Taz as the shooter, but that is not so. It is true that Pezdek stated only that he heard an identification of Taz "through witnesses and Investigator Brown," Resp.'s Ex. O at 30, and testified on cross-examination that he could not provide the names of the witnesses Brown had interviewed or which witness had said what. *See id.* at 45. When Brown testified, he was first asked whether he spoke to the witnesses individually or in a group; he answered that "[e]verybody was kind of in a group." Resp.'s Ex. R at 60. Brown was next asked, "Pursuant to your investigation and from speaking with witnesses, did you learn the identity of the shooter?" *Id.* His response: "A subject by the name of Taz was

given to me." *Id.* Brown was then asked whether he "recall[ed] the names of the witnesses who you spoke to at the scene." *Id.* at 61. In response, Brown said, "Diaz. There was two Diaz's [sic] Ernesto Diaz, he was shot in the butt—in the buttocks. There was another Diaz there. Giovanni Herrera, Richard Ramirez, and there may have been two more. I don't remember their names." *Id.* Brown was next asked this question: "When you spoke with Jaime Diaz, did he supply you with the name of the shooter?" *Id.* After an objection was overruled, Brown said, "He went by the name Taz." *Id.*

From this exchange, it is evident that the only person Brown said had named Taz as the shooter was Jaime Diaz. Although he spoke with other witnesses, Brown did not link the naming of Taz to any other specific witness or to any other unnamed witness. When Diaz testified, he confirmed that he identified Taz to Brown as the shooter. *See id.* at 122 ("Q. Whose name did you give him? A. Taz."). Mustari cannot dispute that he had the opportunity to cross-examine Diaz, including on the topic of his ability to identify Mustari. *See id.* at 137–44, 145–46. Because Diaz, the out-of-court declarant, was subject to cross-examination at trial regarding his out-of-court identification of Taz, the admission of Pezdek's and Brown's testimony regarding that identification did not violate the Confrontation Clause. The appellate court's decision to uphold the trial court's evidentiary ruling on the evidence was not an unreasonable application of Supreme Court precedent.

**D.     Limitation of cross-examination on witness's past probationary status**

Mustari next contends that he suffered an additional violation of his right of confrontation when the trial court sustained an objection to his counsel's questioning of prosecution witness Ramirez about his past probationary status. He argues, citing

*Davis v. Alaska*, 315 U.S. 308 (1974), that a defendant has the right to cross-examine witnesses about "possible bias stemming from . . . probation status." Pet. at 11. As support, Mustari points to a sidebar at which trial counsel said he intended to show that Ramirez was on probation when he initially spoke to police about the shooting. When the trial court asked how this fact would "go to credibility," trial counsel explained that it "goes to bias or motive to testify a certain way." Resp.'s Ex. Q at 250. The trial court said, "I disagree," and denied the motion without further explanation. *Id.*

On appeal, the appellate court distinguished some of the cases Mustari cited for his argument (though not *Davis*) and held it was not an abuse of discretion for the trial court to limit Mustari's cross-examination of Ramirez. The court noted that Mustari was not on probation or the subject of pending charges when he testified, was not an accomplice to the shooting, and admitted to his felony on the stand. The court concluded that "[u]nder these circumstances, any evidence as to Ramirez's prior probation was irrelevant, and no inference could be made that Ramirez would have anything to gain or lose by his testimony." Resp.'s Ex. D at 11–12.

In *Davis*, as in this case, the trial court sustained an objection from the prosecution when defense counsel asked a witness about his probation status. Although the facts of the case were otherwise different from Mustari's, the Court in *Davis* noted "that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis*, 415 U.S. at 316–17. The Court then observed that "defense counsel sought to show the existence of possible bias and prejudice of [the witness], causing him to make a faulty initial identification of petitioner, which in turn could have affected his later in-court

identification of petitioner." *Id.* at 317. In a footnote supporting that statement, the Court quoted Wigmore: "[A] partiality of mind at some former time may be used as the basis of an argument to the same state at the time of testifying; though the ultimate object is to establish partiality at the time of testifying." *Id.* at 317 n.5 (quoting 3A John Henry Wigmore, *Evidence in Trials at Common Law* § 940 at 776 (James H. Chadbourn ed., rev. ed. 1970)). The Court concluded "that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight" to assign to the witness's testimony. *Id.* In particular, the Court said defense counsel was disallowed from showing the reasons the witness may have been biased.

Twelve years later, the Supreme Court vacated and remanded a state court decision relying on *Davis* in *Delaware v. Van Arsdall*, 475 U.S. 673 (1986). In that case, the state court, citing *Davis*, had held that it was "per se error" to impose a "blanket prohibition against exploring potential bias through cross-examination." *Id.* at 677–78. While recognizing the importance of the constitutionally protected right of cross-examination, the Court said that trial judges still have "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination." *Id.* at 679. The Supreme Court agreed that the trial court's limitation of cross-examination in *Van Arsdall* violated the Confrontation Clause; had the cross-examination proceeded, "[a] reasonable jury might have received a significantly different impression of [the witness]'s credibility." *Id.* at 680. However, the Court said it was error for the state appellate court not to engage in harmless error analysis. *Id.* at 680–81. The Court rejected the argument that *Davis* established a per se rule precluding

harmless error review. It emphasized that the testimony of the witness in *Davis* was "crucial" and that excluding the proposed impeachment "had done 'serious damage' to the petitioner's defense." *Id.* at 683 (quoting *Davis*, 415 U.S. at 319). "*Davis* plainly rests on the conclusion that on the facts of that case, the error might well have contributed to the guilty verdict. *Davis* should not be read as establishing, without analysis, a categorical exception to the harmless-error rule." *Id.* In conclusion, the Court held that "the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis." *Id.* at 684. The Court outlined factors a reviewing court should examine in this analysis, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.*

The adjudication of Mustari's claim on this issue in the state courts left much to be desired. The trial court did not explain its decision to limit Mustari's cross-examination, despite Mustari's trial counsel's offer of proof and explanation that Ramirez's probationary status at the time of the shooting—and thus at the time of his identification of Mustari—affected his "bias or motive to testify a certain way." Resp.'s Ex. Q at 250. That was a viable argument; if Ramirez had been shown to be on probation at the time he identified Mustari, that would have enabled the defense to argue that he had a motive to please the authorities and that his testimony at trial identifying Mustari was simply repeating his earlier biased identification. Yet the trial

court rejected Mustari's argument out of hand.

On appeal, although the appellate court explained that Ramirez was not on probation when testifying at trial, it did not address the argument, made plain in *Davis*, that "a faulty initial identification of petitioner . . . could have affected his later in-court identification of petitioner." *Davis*, 415 U.S. at 317. As Mustari noted in his direct appeal brief, "Ramirez's probation status at the time he spoke to police was relevant to Ramirez's bias and motive," and "cross-examination of a witness' possible bias stemming from his probation status was the precluded subject in *Davis v. Alaska*." Resp.'s Ex. A at 38. Yet the appellate court did not mention *Davis*. There is therefore a solid basis to conclude that the state courts unreasonably applied *Davis* when deciding Mustari's case.

That, however, is not the end of the discussion. On habeas corpus review, "a constitutional error is considered harmless unless it can be shown to have 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Jones v. Basinger*, 635 F.3d 1030, 1052 (7th Cir. 2011) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). If a court has "grave doubt" about whether an error affecting substantial rights is harmless, it should grant the writ. *O'Neal v. McAninch*, 513 U.S. 432, 445 (1995). But "in the habeas context, trial errors are often found harmless where the record is replete with overwhelming evidence of the defendant's guilt." *Brown v. Rednour*, 637 F.3d 761, 766 (7th Cir. 2011) (internal quotation marks omitted). The respondent has the burden to prove harmlessness. *United States v. Cureton*, 739 F.3d 1032, 1039 (7th Cir. 2014) (citing *O'Neal*, 513 U.S. at 438–39).

Pfister argues that any impeachment Mustari could have made of Ramirez based

on his probationary status "would have been inconsequential in light of the evidence of petitioner's guilt." Resp. at 25. The Court considers the factors outlined in *Van Arsdall* in assessing whether any unreasonable application of *Davis* was harmless in Mustari's case. First, it is clear that Ramirez's testimony was not "crucial," in contrast to that of the witness in *Davis.* Diaz had identified Mustari as the shooter, both when interviewed at the crime scene and during his testimony at trial. Perhaps more significantly, Mustari confessed to the crime, and his confession was introduced at trial. Thus it is apparent from the record that the overall strength of the prosecution's case was considerable, and Mustari's cross-examination of Ramirez was otherwise extensive. *See* Resp.'s Ex. Q at 226–48. Given the presence of these factors, any error in applying *Davis* was harmless; it did not substantially and injuriously affect the jury's verdict.

**E.    Prosecutor's comments in rebuttal**

In his rebuttal argument at Mustari's trial, the prosecutor said, "The bottom line is the only person who said the Defendant wasn't out there, and that the Defendant wasn't the shooter, and the Defendant wasn't doing all this gang banging was the Defense counselor." Resp.'s Ex. S at 44. Mustari argues that this comment violated his privilege against self-incrimination because it "improperly shifted the burden of proof and commented on defendant's silence." Pet. at 12. In response, Pfister argues that the argument is procedurally defaulted, because Mustari did not raise it through one full round of state court review. Specifically, Pfister says, Mustari raised the issue on direct appeal but not in his PLA on direct review.

Pfister is correct. Mustari did not mention this issue anywhere in his PLA on direct review. "As a general matter, federal habeas courts are precluded from

considering habeas claims that were procedurally defaulted because they were not presented for one complete round of state court review." *Coleman v. Lemke*, 739 F.3d 342, 349 (7th Cir. 2014). In Illinois, this means that "a petitioner must present a claim at each level of the state court system, either on direct appeal or in post-conviction proceedings." *McDowell v. Lemke*, 737 F.3d 476, 482 (7th Cir. 2013); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) ("Boerckel's failure to present three of his federal habeas claims to the Illinois Supreme Court in a timely fashion has resulted in a procedural default of those claims."). Mustari did not do so here. Further, Mustari does not argue that he can establish cause for the default, which would enable the Court to consider the claim. *See Martinez v. Ryan*, 132 S. Ct. 1309, 1316 (2012). He does make a bare contention that the error prejudiced the result of his trial; he asserts that the prosecutor's comment was "highly improper and prejudicial" and that "the jury was left with the impression that the Petitioner was required to present evidence." Pet. at 12. However, the Court need not consider this argument. A habeas corpus petitioner may not present a claim "unless he shows *both* cause *and* prejudice." *Hale v. United States*, 710 F.3d 711, 713 (7th Cir. 2013) (emphasis added); *see also Williams v. Buss*, 538 F.3d 683, 686 (7th Cir. 2008) ("[B]efore we can overlook a procedural default, we must find both cause and prejudice, and Williams never demonstrates the latter."). Furthermore, Mustari does not argue that failure to excuse the default would result in a fundamental miscarriage of justice, in that he is actually innocent or presents some other issue of similar magnitude. *See Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013). The Court therefore cannot review the merits of the claim.

**F.       Length of sentence**

Mustari next argues that his sixty-year sentence was excessive.  It was "disproportionate to other sentences for the same conduct," he says, and the trial court "gave no consideration or mitigation to Petitioner's youthfulness or rehabilitative factor as imposed by the Illinois Constitution, Article I, Section 11."  Pet. at 13.  Therefore, Mustari contends, the sentence also violated the Eighth Amendment to the United States Constitution, citing *Harmelin v. Michigan*, 501 U.S. 957 (1991) and *Solem v. Helm*, 463 U.S. 277 (1983).  Mustari also argues that at the sentencing hearing, the prosecution improperly asked the trial court to "warehouse" him, citing an Illinois appellate case where a sentence was reversed when a judge made a comment using the word "warehouse" about a defendant.  Pet. at 13–14 (citing *People v. Lang*, 366 Ill. App. 3d 588, 853 N.E.2d 90 (2006)).  Mustari also cites several Illinois cases where defendants received lower sentences than his.[2]  In response, Pfister says this claim is defaulted because Mustari did not present a federal constitutional basis for it during state review.  Alternatively, Pfister argues that Mustari's "entire argument in support of those contentions is grounded in Illinois law," and is therefore not cognizable on federal habeas review.  Resp. at 12.

A federal habeas corpus petitioner "must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim."  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotation marks omitted).  In the Seventh Circuit, courts

---

[2] As noted above, the Court declines to view Mustari's sentencing argument as two discrete claims, as Pfister does in his response.  Mustari's argument about the length of his sentence encompasses his argument that the sentence was too long in comparison to others for similar offenses.

typically looks at four factors to determine whether a habeas petitioner fairly presented his federal claim in state court:

> (1) whether the habeas petitioner relied on federal cases that engage in constitutional analysis, (2) whether the petitioner relied on state cases that apply constitutional analysis to similar facts, (3) whether the petitioner framed the claims in terms so particular as to call to mind a specific constitutional right, and (4) whether the petition alleges a pattern of facts within the mainstream of constitutional litigation.

*McDowell v. Lemke*, 737 F.3d 476, 482 (7th Cir. 2013). This array of factors does not "require a hypertechnical congruence between the claims made in the federal and state courts," but "[t]he factual and legal substance of the habeas petition must be the same as what was raised in the state." *Villanueva v. Anglin*, 719 F.3d 769, 775 (7th Cir. 2013). "[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin*, 541 U.S. at 32.

In his direct appeal, Mustari argued that the sentencing court did not comply with the Illinois constitution in failing to act on mitigation evidence he had provided. He also contended that the prosecution's comment about wishing to "warehouse" him constituted "an inappropriate aggravation factor," again citing *Lang*, an Illinois appellate case. Resp.'s Ex. A at 50. Mustari did not cite any federal basis for these arguments in his reply on direct appeal or in his PLA on direct appeal. There, he again argued the "warehouse" comment was inappropriate and cited the mitigating evidence he presented. He also contended that his case presented "a split in authority" with two other Illinois appellate cases in which sentences were found improper. Resp.'s Ex. E at 19 (citing *Lang*, 366 Ill. App. 3d at 590–91; *People v. Jeter*, 247 Ill. App. 3d 120, 131–

32, 616 N.E.2d 1256, 1264–65 (1993)).  At no point did Mustari cite the U.S.

Constitution or any federal cases in making these arguments on direct appeal.  Of the

Illinois cases he cited in his briefs on direct appeal, only three cite any federal law, and

none of them includes federal constitutional analysis on this question.[3]  It is clear that

Mustari was arguing his sentence was excessive based solely on state law—and

indeed, by asking the Illinois Supreme Court to resolve a conflict in Illinois law.  His

arguments would not "evoke a familiar constitutional constraint and alert the state courts

to a federal constitutional issue."  *Anderson v. Benik*, 471 F.3d 811, 815 (7th Cir. 2006)

(holding claims to be procedurally defaulted when based solely on Wisconsin law).

Mustari's federal constitutional argument is procedurally defaulted because it was not

fairly presented to the state courts.

  As with his claim on the prosecutor's rebuttal comments, Mustari does not

contend that he can establish cause for the default and prejudice flowing from the error.

And he does not argue a fundamental miscarriage of justice to excuse the default.  The

Court therefore may not review the merits of this claim.

---

[3] *See People v. Brown*, 243 Ill. App. 3d 170, 612 N.E.2d 14 (1993) (citing state case
quoting *Jackson v. Virginia*, 443 U.S. 307 (1979) on sufficiency-of-the-evidence claim);
*People v. Daniels*, 173 Ill. App. 3d 752, 527 N.E.2d 993 (1988) (citing *Mempa v. Rhay*,
389 U.S. 128 (1967) on Sixth Amendment right to counsel claim); *People v. Bailey*,
88 Ill. App. 3d 416, 410 N.E. 2d 545 (1980) (citing *Chapman v. California*, 386 U.S. 18
(1967) for harmless error standard).  It should also be noted that Mustari argues in this
claim that "other sentences for the same conduct" were shorter than his own.  However,
in the cases he cites, only one involved a conviction for attempted murder and
aggravated battery, but it differed from Mustari's case in that the defendants had been
convicted of multiple other crimes and were appealing only their attempted murder
sentences.  *See People v. Curtis*, 244 Ill. App. 3d 241, 241–42, 614 N.E.2d 389, 390
(1993).  The other cases involved defendants convicted of other crimes.  *See Brown*
(first-degree murder); *People v. Center*, 198 Ill. App. 3d 1025, 556 N.E. 2d 724 (1990)
(burglary); *Daniels* (home invasion and armed robbery); *Bailey* (aiding a fugitive).

**G.    Assistance of trial counsel**

Finally, Mustari contends that his trial counsel was ineffective for failing to investigate his fitness to stand trial and raise the issue of his fitness with the trial court. (He also contends appellate counsel was ineffective for failing to raise this issue on direct appeal; the Court will address that claim in the following section.)  Mustari here incorporates by reference the same argument from his post-conviction petition.  He argues that he was suffering from ADD and ADHD at his trial and that his trial counsel failed to interview psychologists who had diagnosed him.  He also says trial counsel had to repeatedly explain the events of the trial to Mustari and thus should have been aware of his condition.  He also contends that trial counsel should have raised with the trial court the issue of his fitness to stand trial.

The Illinois Appellate Court rejected Mustari's ineffective assistance of counsel claim on its merits.  Thus this Court's review is "doubly deferential," owing to the application of both *Strickland* and 28 U.S.C. § 2254(d), which requires deference to state court decisions.  *Bailey v. Lemke*, 735 F.3d 945, 949 (7th Cir. 2013).  "We take a 'highly deferential' look at counsel's performance, through the 'deferential lens of § 2254(d).'"  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (citations omitted) (quoting *Strickland*, 466 U.S. at 689; *Knowles v. Mirzayance*, 556 U.S. 111, 121 n.2 (2009)).  With regard to counsel's duty to request a fitness hearing, as with any other potential defense, "[c]ounsel has an obligation either to investigate possible defenses or make reasonable decisions that particular investigations are unnecessary." *Burt v. Uchtman*, 422 F.3d 557, 566 (7th Cir. 2005).  When a petitioner claims that his counsel was ineffective for failing to request such a hearing under *Strickland*, a court must ask

"whether there is a reasonable probability the defendant would have been found unfit had a hearing been held." *Id.* at 567.

In Mustari's case, the appellate court correctly analyzed his claim under "the familiar standard set forth in *Strickland*," which addresses both counsel's performance and the issue of prejudice. *Mustari*, 2011 IL App (1st) 100328-U, ¶ 13. It proceeded to focus on the prejudice requirement of *Strickland*, noting that in Illinois, prejudice from an attorney's failure to request a fitness hearing requires facts raising "a bona fide doubt of [petitioner's] ability" to understand his proceedings or assist in his defense. *Id.* ¶ 15. The appellate court pointed to Mustari's "express disavowal of the need for medication," along with his "testifying cogently and coherently, absent any expression of confusion, over some 89 pages of transcript that he was beaten and bribed by police officers to the point where he inculpated himself in the offense." *Id.* ¶ 17. The court observed that Mustari's later interactions with the court "were short" but that he responded "competently" to subsequent questions and proceedings. *Id.* The court then cited a report by a clinical psychologist who examined Mustari a year before the shooting, who determined that Mustari was "oriented to person, place, and time" and had no psychotic symptoms. *Id.* ¶ 18. The court further noted that the trial court was aware of Mustari's mental health history but did not order a fitness hearing of its own volition. These factors led the court to conclude that Mustari had not raised a bona fide doubt of his fitness and thus that his attorney's failure to investigate his mental state or request a fitness hearing was not ineffective.

This conclusion was not unreasonable. The evidence Mustari points to is insufficient to suggest a reasonable probability he would be found unfit. Most

prominently, the evidence from Mustari's pretrial hearing amply demonstrated his fitness. His extensive testimony and responses to cross-examination were adequate to show that he had "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *See Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam); *Warren v. Baenen*, 712 F.3d 1090, 1100 (7th Cir. 2013). As Mustari noted in his testimony, he was not on medication at the time he testified, nor had he taken any ever for his ADHD. Furthermore, the psychological evaluation the appellate court cited supported the conclusion that the trial court would not have found Mustari unfit to stand trial. In January 2002, a licensed clinical psychologist concluded that Mustari "is appropriately oriented to person, place, and time," showed "no signs of psychotic symptomology," and was "within appropriate ranges." Resp.'s Ex. W at C000053. The psychologist's report further noted that although Mustari's demeanor "may represent some ADHD symptomatology," he showed no "prominent features of learning disability." *Id.* at C000059. This report does not describe a person who was not competent to understand legal proceedings. Given this evidence, the Court concludes that it was not unreasonable for the appellate court to determine that any failure of Mustari's trial counsel to investigate and present his mental health history was not prejudicial and to reject Mustari's ineffective assistance claim.

**H.      Assistance of appellate counsel**

Mustari's claim of ineffective assistance on the part of his appellate counsel flows from the previous claim: he contends that appellate counsel should have raised the issue of trial counsel's failure to investigate Mustari's mental health history and request

a fitness hearing.  He argues that "if this court finds that this issue could have been raised on direct appeal, then appellate counsel was ineffective for failure to raise trial counsel['s] ineffective[ness]."  Pet. Ex. D at 14.  In response, Pfister first argues that this claim is defaulted because Mustari did not include the claim in his post-conviction appeal or PLA.  Pfister also contends that "the state appellate court necessarily, if not explicitly" held that this argument lacked merit, Resp. at 30, apparently because it decided that Mustari's trial counsel claim lacked merit.  Alternatively, Pfister says the claim would lack merit even if reviewed *de novo*, because appellate counsel has discretion about what arguments to bring on appeal, and it is rare to bring an ineffective assistance claim on direct review when collateral proceedings are available.  Pfister argues that it was reasonable for appellate counsel not to pursue a claim that trial counsel was ineffective "when the record on appeal showed petitioner's competent participation in the proceedings."  *Id.* at 31.

Pfister is not entirely correct that Mustari's claim of ineffective assistance of appellate counsel is procedurally defaulted.  Pfister says Mustari did not make the claim in his post-conviction appeal or PLA.  Although Mustari may not have made the appellate counsel argument as a standalone claim, he did at least mention it at each stage of his post-conviction proceedings.  *See* Resp.'s Ex. G at 4 (post-conviction appeal brief arguing that "trial counsel's substandard performance is apparent from the record and should have been raised on direct appeal"); Resp.'s Ex. K at 6 (post-conviction PLA arguing "that appellate counsel failed to raise these facts on direct appeal").

Nonetheless, considering the merits of Mustari's claim, it is still apparent that the

appellate court's rejection of this claim was not unreasonable. Because it was not unreasonable to decide that trial counsel was not ineffective for failing to investigate Mustari's mental health history and request a fitness hearing, appellate counsel cannot have been ineffective for failing to argue trial counsel's ineffectiveness on appeal. The appellate court noted Mustari's appellate counsel argument in affirming the trial court's summary dismissal of Mustari's post-conviction petition. But it then concluded that there was no arguable basis for his ineffective assistance of trial counsel's claim, obviating the need to discuss the appellate counsel argument.

## I.    Certificate of appealability

When a district court enters a final judgment that dismisses a prisoner's habeas corpus petition, it must issue or deny a certificate of appealability (COA). "[F]ederal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners" in the absence of a COA. *Miller–El v. Cockrell*, 537 U.S. 322, 336 (2003). To obtain a COA, the petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A court should issue a COA if it determines that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). When a district court denies a claim on procedural grounds, the petitioner must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

The Court's determinations that the state courts reasonably adjudicated some of Mustari's claims, that other claims are procedurally defaulted, and that other claims are barred by *Stone v. Powell* are not fairly debatable. The Court therefore declines to issue a certificate of appealability.

## Conclusion

For the foregoing reasons, the Court denies Mustari's petition for a writ of habeas corpus [docket no. 1] and directs the Clerk to enter judgment in favor of the respondent. The Court also declines to issue a certificate of appealability.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: February 27, 2014